434 March 5, 2012 No. 53

IN THE OREGON TAX COURT
REGULAR DIVISION

DEPARTMENT OF REVENUE,
*Plaintiff,*

*v.*

Steven H. BAHR
and Laureen R. Bahr,
*Defendants.*

(TC 4926)

Plaintiff Department of Revenue (the department) appealed from a Magistrate Division decision regarding recognition of gain on an IRC section 1031 like-kind exchange of property, arguing that Defendants (taxpayers) were not entitled to a like-kind exchange tax deferral. At oral argument on the parties' cross-motions, the parties agreed that the court could submit a decision on a stipulated record if the court determined that summary judgment was inappropriate. Denying both parties' motions for summary judgment, the court ruled that there were contested issues of material fact such that both parties' motions were denied but also that as the department was the party seeking affirmative relief it had the burden of showing that taxpayers more likely than not had held the exchange lots primarily for sale, but the facts on that issue were in equipoise and the court could not find for the department in that circumstance.

Oral argument on cross-motions for summary judgment was held in the courtroom of the Oregon Tax Court on May 24, 2011.

Douglas M. Adair, Senior Assistant Attorney General, Department of Justice, Salem, filed the motion and argued the cause for Plaintiff (the department).

Defendants Steven H. Bahr and Laureen R. Bahr filed a response and argued the cause for Defendants (taxpayers) *pro se*.

Decision rendered on March 5, 2012.

**HENRY C. BREITHAUPT, Judge.**

I. INTRODUCTION

This case initially came before the court on cross-motions for summary judgment on a stipulated record. At the oral argument on the motions, the parties agreed that if the court should find this case inappropriate for decision

on motions for summary judgment, the case was also being submitted for decision on a stipulated record.

Plaintiff (the department) argues that Defendants Steven H. Bahr and Laureen R. Bahr (taxpayers) must recognize gain from the conveyance of certain real property as Oregon taxable income in the tax year 2005. Taxpayers argue that the real property in question was "exchanged solely for property of like kind" under IRC section 1031, and, therefore, that no gain need be recognized.[1]

## II.   FACTS

In 1996, taxpayers entered into a "like-kind" exchange under IRC section 1031 whereby taxpayers received an undivided one-half interest in an unimproved five acre parcel located on June Reid Place in Keizer, Oregon (the Clear Lake property) in exchange for taxpayers' interest in a duplex located in Salem, Oregon. Rodney and Loretta Lent (the Lents)—with whom taxpayers had previously co-owned the duplex—acquired the other undivided one-half interest in the Clear Lake property.[2] The department does not dispute that taxpayers and the Lents had held the duplex in Salem as an investment property, and likewise acquired the Clear Lake property for use as an investment property.

On June 28, 2000, Salem-Keizer School District 24J paid $767,520 to acquire a 9.09 acre parcel adjacent to the Clear Lake Property (the school district property). On September 25, 2001, the school district acquired a permit to build a new school on the school district property. The school district completed construction sometime prior to July 12, 2002.

During the construction of the school, the Lents were approached by a developer, Darrell Beam (Beam), with an offer to purchase the Clear Lake property for $60,000 per acre. Noting that this was significantly less than what the Salem-Keizer school district had paid for the school district property, taxpayers and the Lents refused the offer. In the course of these discussions, Beam indicated that if the Clear Lake property were to be subdivided, he would be willing to purchase the subdivided lots for $58,000 per lot.

---

[1] All references to the Internal Revenue Code (IRC) are to the 2004 edition.

[2] Lorretta Lent and Laureen Bahr are sisters.

During February and March of 2004—roughly two years after the initial discussions with Beam—the Lents contacted Beam about his interest in purchasing subdivided, improved lots on the Clear Lake property. On March 10, 2004, the Lents—acting both for themselves and as agents for taxpayers—applied to the City of Keizer for a permit to subdivide the Clear Lake property.

On May 7, 2004, taxpayers, the Lents, and Beam entered into an option agreement that gave Beam an option to purchase 22 lots within the Clear Lake property for $58,000 per lot. The lots covered by the option included, among others, lots 6, 7, 8 and 13 (the exchange lots)—the lots at issue in this case.[3] Beam paid taxpayers and the Lents a total of $100,000 as consideration for the option.

The option agreement provided for an initial term of 10 days, starting on the date Beam received written notice from taxpayers and the Lents that the City of Keizer had authorized issuance of building permits for the lots subject to the option. During this initial term, Beam was obligated to exercise his option as to 12 of the 22 lots or forfeit the $100,000 he had paid for the option. After giving notice, Beam had a further 20 days to close the sales on these first 12 houses. If Beam exercised his option on at least 12 lots during this initial term, the agreement provided for a "subsequent term" running for 180 days from the start of the initial term, during which Beam could exercise his option with regard to any or all of the remaining 10 lots. The option agreement further provided that if Beam were to exercise his option, he would be credited $4,545.45 toward the $58,000 purchase price for each lot.[4] The option agreement did not state that Beam was required to take the 22 lots

[3] The option agreement states that the option agreement covered "lots 2-14, 16-20[,] and 24-27." The parties have stipulated, however, that the option agreement in fact covered lots 1-13, 16-20, and 24-27. Inasmuch as the stipulated range is more consistent with the subsequent disposition of the lots, the court infers that the parties may have adjusted the lots covered by the option agreement. In any event, all four of the lots at issue in this case were covered by the option agreement.

[4] $4,545.45 is roughly 1/22 of $100,000; thus, the credit appears to be a pro rata application of the $100,000 paid by Beam for the option toward the purchase price of each of the lots covered by the option agreement.

in any particular order or otherwise restrict Beam's right to exercise his option as to any of the lots covered by the agreement during the term of the option. In addition, the agreement did not contain any terms limiting Beam's ability to transfer or assign his rights.

The City of Keizer approved the application to subdivide the Clear Lake property on June 10, 2004. In all, taxpayers and the Lents incurred site development costs on the subdivided Clear Lake property totaling $524, 038. In part to cover these development costs, taxpayers and the Lents took out a $550,000 loan from Umpqua Bank. The principal amount of this loan was to be repaid in a lump sum payment no later than December 8, 2005. Taxpayers and the Lents split the costs of site development equally, though Loretta Lent managed the site development activity for the two couples.

At the beginning of 2005, the Clear Lake property consisted of 27 lots—26 of which were jointly owned by taxpayers and the Lents.[5] On January 5, 2005, taxpayers and the Lents sold 12 lots to Craig and Sheila Poole (the Pooles), third party affiliates of Beam.[6] Taxpayers and the Lents used the proceeds of this first sale to repay the loan from Umpqua Bank.

Following the first sale to the Pooles, taxpayers and the Lents conveyed several lots to Beam and to third parties. Taxpayers and the Lents also engaged in transactions among themselves with the result that several lots ceased to be jointly owned and instead became the property of either the Lents or taxpayers. Taxpayers acquired the Lents' one-half interest in one such lot on January 5, 2005, and subsequently built a duplex on that lot.

---

[5] One of the lots, designated "Lot 22" in the documents provided to the court by the parties, was owned solely by the Lents.

[6] At oral argument taxpayers and the department both stated that the Pooles were essentially acting as a source of financing for Beam. The department further stated its understanding that Beam may have assigned some of his rights under the option agreement to the Pooles, though there is no direct evidence of this in the record. From the discussion of this issue at oral argument, it appears that as far as all of the parties involved were concerned, the sale of the first twelve lots to the Pooles amounted to Beam exercising his option to purchase those lots.

Between January 5, 2005, and May 31, 2005, Beam acquired four of the lots covered by the option agreement in addition to the 12 acquired by the Pooles on January 5, 2005. During the summer of 2005, Beam acquired an additional two lots on the Clear Lake property: one on June 9, 2005, and a second on July 6, 2005. After the July 6 purchase, there followed a lull of approximately three months during which neither Beam nor the Pooles acquired any further lots on the Clear Lake property.

On October 5, 2005, taxpayers and the Lents transferred the exchange lots to the Pooles as part of a transaction structured as a like-kind exchange under IRC section 1031 in which Investment Property Exchange Services, Inc. (IPX) acted as a qualified intermediary.[7] For their part in the transaction, the Pooles remitted $214,256 to IPX for use in acquiring replacement property for taxpayers and the Lents. In December of 2005 taxpayers acquired from IPX a duplex in Aumsville, Oregon as replacement property.

Consistent with their treatment of the disposition of the exchange lots as a like-kind exchange, taxpayers did not recognize any gain as a result of the conveyance of those four lots on either their Oregon or their federal income returns for the 2005 tax years. On audit, the department's auditor determined that the conveyance of the exchange lots did not qualify as a like-kind exchange under IRC section 1031 because taxpayers had held the exchange lots for sale, rather than for investment. The department therefore adjusted taxpayers' 2005 Oregon personal income tax return to recognize $127,188 as gain resulting from the disposition of taxpayers' interests in the exchange lots in tax year 2005.

Taxpayers appealed the adjustment to the Magistrate Division. In a decision dated September 25, 2009, the magistrate found in favor of taxpayers on the grounds that taxpayers were not "developers in the business of selling

_____

[7]  The use of a "qualified intermediary" is one of four "safe harbors" recognized by the regulations implementing IRC section 1031. In a transaction involving a qualified intermediary, the intermediary acquires the "relinquished property" from the taxpayer, transfers the relinquished property, acquires a "replacement property," and conveys the replacement property to the taxpayer. In that manner the taxpayer avoids actual or constructive receipt of money from the conveyance of the taxpayer's property. *See* Treas Reg § 1.1031(k)-1(g)(4).

subdivision lots for a profit." *Bahr v. Dept. of Rev.*, TC-MD No 080525B (Sept 25, 2009) (slip op at 5.) The department appeals from the decision of the magistrate.

### III.   ISSUE

Did taxpayer's conveyance of the four lots qualify for treatment as a like-kind exchange under IRC section 1031?

### IV.   ANALYSIS

IRC section 1031(a) provides, in pertinent part:

"(1)   In general. No gain or loss shall be recognized on the exchange of property held for productive use in a trade or business or for investment if such property is exchanged solely for property of like kind which is to be held either for productive use in a trade or business or for investment.

"(2)   Exception. This subsection shall not apply to any exchange of—

"(A)   stock in trade or other property held primarily for sale[.]"

The difference between property held for "investment" and property held "primarily for sale" is not explicitly stated in the text of IRC section 1031. Binding federal case law states that for real property to be held for investment at the time of a purported exchange, the taxpayer must lack "intent either to liquidate the investment or to use it for personal pursuits." *See Bolker v. Commissioner*, 760 F2d 1039, 1045 (9th Cir 1985). Because a property owner's purposes with regard to any given property can change over time, the critical question is what the property owner's intentions toward the property were at the time that the property owner conveyed the property to another. *Neal T. Baker Enterprises, Inc. v. Commissioner*, 76 TCM 301, 307 (1998).

### A.   *The Parties' Cross-Motions for Summary Judgment*

Summary judgment is only appropriate where, on the record before the court, "there is no genuine issue as to any material fact" and "the moving party is entitled to prevail as a matter of law." Tax Court Rule (TCR) 47 C. "No genuine issue as to a material fact" means that "based upon

the record before the court viewed in a manner most favorable to the adverse party, no 'objectively reasonable'" finder of fact could find for the party opposing the motion. *Id.*

Taxpayers' intention with regard to the exchange lots is, of course, a question of fact. *Neal T. Baker Enterprises, Inc.*, 76 TCM at 306. Taxpayers and the department each take very different views on the answer to that question, and, as the court will discuss below, there is evidence in the record from which an objectively reasonable finder of fact could conceivably find for either party. Consequently, both the motion for summary judgment of the department and the motion for summary judgment of taxpayers must be denied.

B.   *Decision of the case on the record*

Pursuant to the agreement of the parties at oral argument, the court will decide this case as if it had been submitted to the court for decision after trial on a record as established by the parties to this case. The key difference here is that whereas in section IV(A) above, the court could only rule in favor of one party or the other if "no genuine issue of material fact" existed and one party or the other was "entitled to prevail as a matter of law," the court must now review the evidence in the record to determine whether on October 5, 2005, taxpayers more likely than not held the exchange lots "primarily for sale" and not "for investment." The burden of proof with regard to this issue lies with the party seeking affirmative relief. ORS 305.427.[8] In this case, the department has appealed from a decision for taxpayers in the Magistrate Division. The burden, therefore, lies with the department. *U.S. Bancorp v. Dept. of Rev.*, 17 OTR 232, 244 (2003).

Taxpayers' intentions are subjective and are thus, in some sense, not truly knowable to the court. The court therefore must look to the circumstances surrounding taxpayers' conveyance of the exchange lots, and from those circumstances determine whether taxpayers most likely held those four lots "for investment" or "primarily for sale."

---

[8]  All references to the Oregon Revised Statutes (ORS) are to 2009.

In answering this question, the U.S. Tax Court looks for guidance to the factors considered in determining whether property is "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" under IRC section 1221(a)(1). These factors include:

(1) The purpose for which the property was initially acquired;

(2) The purpose for which the property was subsequently held;

(3) The extent to which improvements, if any, were made to the property by the taxpayers;

(4) The frequency, number, and continuity of sales;

(5) The extent and nature of the transactions involved;

(6) The ordinary business of the taxpayer;

(7) The extent of advertising, promotion, or other active efforts used in soliciting buyers for the sale of the property;

(8) The listing of property with brokers; and

(9) The purpose for which the property was held at the time of the sale.

*Neal T. Baker Enterprises, Inc.*, 76 TCM at 306. This court will utilize the same method. In applying these factors, however, the court is mindful that they can only be used as guideposts. The focus of IRC section 1221(a)(1) is on whether a given property is "stock in trade of the taxpayer * * * or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." IRC section 1031(a)(2)(A), on the other hand, looks only to whether property is held "primarily for sale." Consequently, some of the factors listed above are accorded greater weight than others. *Id.* Of these factors, the court considers factors (9), (1) and (2) to be of the greatest importance in deciding this case: factor (9) because it takes in the ultimate question in this case—taxpayers' intentions toward the exchange lots on October 5, 2005; factors (1) and (2) because they provide

the historical background necessary to answer that question. The remaining factors are referred to in this analysis only inasmuch as they aid in analyzing factors (9), (1), and (2).

1. *Taxpayers' purpose in acquiring the Clear Lake property and the purpose for which the Clear Lake Property was subsequently held*

The department does not dispute that at the time taxpayers and the Lents acquired the Clear Lake property, they intended to hold the property for investment purposes. Furthermore, the department does not dispute that taxpayers and the Lents held the Clear Lake property as investment property for some time after acquiring it. However, the department takes the position that some time prior to October 5, 2005, taxpayers ceased holding the exchange lots as investment property, and began holding them "primarily for sale."

The department points particularly, but not exclusively, to the option agreement taxpayers and the Lents entered into with Beam on May 7, 2004, as a clear indication that taxpayers held the exchange lots "primarily for sale." The department also points to actions undertaken by taxpayers, or by the Lents on behalf of taxpayers, as further evidence that taxpayers' purpose in holding the exchange lots changed from "investment" to "primarily for sale" at some point prior to October 5, 2005. These actions include contacting Beam in early 2004 to see if he was still interested in purchasing improved lots on a subdivided Clear Lake property, obtaining approval to subdivide the Clear Lake property, constructing the site improvements called for by the option agreement, and taking out a loan to finance those improvements.

The record indicates that in 2002, when Beam initially approached taxpayers and the Lents, he did so more or less unsolicited. This would tend to indicate that, at least at that time, taxpayers and the Lents did not hold the Clear Lake Property "primarily for sale." By that same token, however, the Lents' conduct in contacting Beam in early 2004—two years after Beam made his initial offer—to see if Beam was still interested in purchasing improved lots on

the Clear Lake property tends to indicate that the Lents, at least, had decided to liquidate their investment in the Clear Lake property. Beam's offer was, after all, to purchase improved lots on the Clear Lake property for $58,000 apiece. Taxpayers' decision in March of 2004 to authorize the Lents to act as their agent in applying for a permit to subdivide the Clear Lake property indicates that taxpayers had also decided to liquidate their investment by selling at least some of the resultant lots to Beam.

Taxpayers' further role in obtaining a loan to finance site improvements and paying for roughly half of the cost of constructing improvements on the Clear Lake property also indicates an intention to sell lots on the Clear Lake property, and particularly to sell the lots covered by the option agreement. The record indicates that taxpayers and the Lents used the proceeds of the first sale of 12 lots to the Pooles to pay off the loan from Umpqua Bank used to finance the subdivision and improvement of the Clear Lake Property. Under the circumstances in this case, it seems almost certain that taxpayers and the Lents anticipated doing just this when taxpayers and the Lents took out the loan. Hence, taxpayers and the Lents were planning to sell some subset of the lots covered by the option agreement in order to pay for the cost of developing the Clear Lake property.

In the court's view, the option agreement between taxpayers, the Lents, and Beam—in combination with the activities of taxpayers, or of the Lents on taxpayers' behalf—strongly favor a finding that on or before May 7, 2004, taxpayers ceased to regard the 22 lots covered by the option agreement—including the exchange lots—primarily as an investment to be held, and began to regard them as something to be sold in the near future. The agreement specifically states that Beam had the right to "purchase" the lots he desired on the Clear Lake property—lots that included the four lots at issue in this case. Nothing in the agreement, or in taxpayers' conduct toward the exchange lots, suggests that taxpayers regarded the exchange lots as in any way distinct from the other lots covered by the option agreement. If, during the term of the option, Beam had chosen to exercise his option with regard to any or all of the exchange lots and had come forward with the agreed purchase price, taxpayers

would have had no choice but to oblige. This is impossible to reconcile with the notion that taxpayers continued to hold the exchange lots as investment property during the term of the option agreement. Rather, it appears that by happenstance Beam simply did not elect to exercise his option to purchase those four specific lots during this time.

The court therefore concludes that some time prior to May 7, 2004, taxpayers ceased to regard the exchange lots as property held for "investment" and from that point through at least the termination of the option agreement held the exchange lots "primarily for sale."

2. *The purpose for which taxpayers held the exchange lots on October 5, 2005*

However, there is still one more question for the court to answer. Having determined that taxpayers most likely began to regard the exchange lots as "primarily for sale" some time before May 7, 2004, the court must now determine whether taxpayers most likely still held the exchange properties "primarily for sale" on October 5, 2005—the date that taxpayers conveyed the exchange lots, through IPX, to the Pooles.

There is very little direct evidence on this issue in the record. The department appears content to rely upon the evidence discussed above tending to show that taxpayers ceased to hold the exchange lots as investment property some time prior to May 7, 2004. Taxpayers, in turn, argue that they held the exchange lots as investment property throughout their ownership of the exchange lots, including on the day that they conveyed their interest in the lots to the Pooles.

On this issue the option agreement between taxpayers, the Lents, and Beam is once again a critical consideration. As the court discussed above, while the option agreement was in effect it served as a strong indication that taxpayers intended to liquidate their investment in the exchange lots, along with the other lots covered by the option agreement, despite their representations to the contrary. This was primarily because, by entering into the option agreement, taxpayers had signed away their right

to refuse to liquidate their investment for at least the term of the option, providing Beam met certain conditions. For reasons discussed below, however, it appears that the term of the option agreement may have expired well before the Pooles acquired the exchange lots from taxpayers and the Lents. This opens the door to the possibility that, having already changed their intentions toward the exchange lots once from "investment" to "primarily for sale," taxpayers may have once again changed their intentions with regard to the exchange lots.

As was discussed above, the option agreement called for taxpayers and the Lents to notify Beam when the City of Keizer authorized the issuance of building permits for the lots on the Clear Lake property. The "initial term" of the option began the day Beam received such notice and from that day Beam had 10 days to exercise his option on 12 of the lots, or forfeit his $100,000. If Beam exercised his option during this initial term, the agreement provided for a "subsequent term" of an additional 170 days for Beam to purchase the remaining 10 lots. During the initial term Beam had 20 days to close his purchases after giving taxpayers and the Lents notice that he intended to exercise his option.

The record does not contain any direct indication as to when taxpayers and the Lents first sent Beam their notice that the city of Keizer had authorized the issuance of building permits for the lots on the newly-subdivided Clear Lake property and thus started the term of the option. The parties have, however, stipulated that taxpayers and the Lents "sold" the first 12 lots to the Pooles on January 5, 2005. Given the time periods provided for in the option agreement, the court infers that the term of Beam's option began on or about December 6, 2004. Starting from that date, the term would have expired on or about June 4, 2005. At this point in time, Beam had purchased four lots on top of the 12 purchased by the Pooles in January of 2005.

There is some indication in the record that the parties may have continued to act as if the option agreement remained in force after June 4, 2005. For instance, Beam acquired two lots in June and July of 2005: the first on June 9,

and the second on July 6. The parties have stipulated that the purchase price for each of these lots was $53,564. At first glance, this appears to be a substantial reduction from the per lot price agreed to by the parties to the option agreement. However, when one takes into account the $4,545.45 credit toward the per lot price contained in the option agreement, $53,564 amounts to only about $109 more than what Beam and the Pooles would have paid out of pocket for each the lots purchased during the term of the option agreement. Likewise, when the Pooles acquired the exchange lots on October 5, 2005, they paid $214,256 to IPX as the qualified intermediary in an IRC section 1031 exchange. $214,256, divided evenly between the four exchange lots, comes out to $53,564 per lot—again, only a slight departure from the $58,000 per lot price contained in the option agreement once the credit provided for in the option agreement is taken into account.

In short, even though Beam's option appears to have expired on or about June 4, 2005, taxpayers and the Lents seem to have continued to abide by the per lot price set in the option agreement. In addition, taxpayers and the Lents appear to have continued crediting Beam and the Pooles with a pro rata share of the $100,000 that Beam initially paid for the option, though the option agreement seems to call for Beam to forfeit that money if he failed to purchase all 22 lots within the time specified by the option agreement.

However, this information on its own does not require the court to conclude that taxpayers, the Lents, and Beam did, in fact, agree to extend the option agreement. The per lot price in these subsequent sales could quite simply be coincidental. Alternatively, the parties may well have agreed to continue honoring the per lot price and credit terms of the agreement, without giving effect to the other terms; quite simply, nothing in the record sheds light on this issue.

The record does show, however, that by this time taxpayers and the Lents had paid off the Umpqua Bank loan that was used to finance the subdivision and improvement of the Clear Lake property. The need of taxpayers and the Lents to repay this loan through the sale of lots covered

by the option agreement was an important factor in the court's determination above that taxpayers most likely held the exchange lots "primarily for sale" during the term of the option. With that loan no longer outstanding, the court sees very little reason why either taxpayers alone, or taxpayers and the Lents jointly, could not have decided to hold the exchange lots as investment property once the term of the option agreement had expired.

The record shows that taxpayers have a history of holding land as an investment. The department does not dispute that taxpayers held the duplex in Salem that they exchanged for their interest in the Clear Lake property as an investment property. Furthermore, during the term of the option agreement with Beam, taxpayers acquired sole ownership of a lot on the Clear Lake property not covered by the option agreement and erected another duplex on that lot. The court infers that taxpayers held this duplex as an investment. Finally, taxpayers acquired yet a third duplex as replacement property after conveying their interest in the Clear Lake property to the Pooles. Taxpayers represent, and the department does not appear to dispute, that taxpayers hold this property as an investment property as well. The fact that taxpayers subsequently acquired an investment property to replace the exchange lots does not, of course, necessarily mean that taxpayers held the exchange lots themselves as investment property at the time of their conveyance. It does, however, go to establishing a pattern of behavior on the part of taxpayers. It also shows that whatever taxpayers' intentions toward the exchange lots during the term of Beam's option, taxpayers ultimately did not liquidate their investment in the exchange lots.

In addition, as was noted above, there was a roughly three month hiatus between the last purchase of a lot on the Clear Lake property by Beam and the conveyance of the exchange lots to the Pooles. There is no evidence in the record showing that taxpayer took any steps to solicit the sale of the exchange lots during this period, as might be expected if taxpayers intended to sell the exchange lots.

As the party seeking affirmative relief in this case, the department bears the burden of showing that taxpayers

more likely than not held the exchange lots "primarily for sale" on October 5, 2005. While the record does support the notion that taxpayers most likely held the exchange lots primarily for sale during the term of Beam's option, it appears that the term of the option expired prior to October 5, 2005. In addition, by October 5, 2005, taxpayers and the Lents had repaid their loan from Umpqua Bank. Thus, two critical factors leading the court to conclude above that taxpayers held the exchange lots primarily for sale during the term of Beam's option were no longer present when taxpayers and the Lents conveyed the exchange lots to the Pooles.

While the record before the court could support an inference that taxpayers held the exchange lots "primarily for sale" on October 5, 2005, it could also support an equally compelling inference that taxpayers, having held the exchange lots "primarily for sale" from May of 2004 through June of 2005, subsequently reverted to holding the exchange lots "for investment." In other words, the record on this issue is in equipoise. Under such circumstances, the court must find against the party bearing the burden of proof. *U.S. Bancorp*, 17 OTR at 244.

## V.   CONCLUSION

There are contested issues of material fact in this case such that both parties' motions for summary judgment must be denied.

In addition, while the record establishes that taxpayers most likely held the exchange lots "primarily for sale" during the term of Beam's option, the court finds that on October 5, 2005, it is equally as likely that taxpayers held the exchange lots "for investment" as it is that taxpayers held the exchange lots "primarily for sale." Now, therefore,

IT IS DECIDED that taxpayers' conveyance of the exchange lots qualifies for treatment as a "like kind" exchange under IRC section 1031.